**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ADVANCED POWDER SOLUTIONS,** | § | |
| **INC., BUBBLETIGHT, LLC, AND** | § | |
| **SWM ENTERPRISES, LLC D/B/A** | § | |
| **INDUSTRIAL SUPPLY COMPANY,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **CIVIL ACTION NO. _____** |
| **v.** | § | |
| | § | |
| **ANDREW SHERMAN, TERVES INC.,** | § | |
| **AND JAMES HUDDLESTON,** | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY
RESTRAINING ORDER, REQUEST FOR PRELIMINARY INJUNCTION, AND
REQUEST FOR PERMANENT INJUNCTION**

Plaintiffs Advanced Powder Solutions, Inc. ("APS"), Bubbletight, LLC ("Bubbletight"), and SWM Enterprises, LLC, d/b/a Industrial Supply Company ("Industrial Supply") hereby bring this Original Complaint, Application for Temporary Restraining Order, Request for Preliminary Injunction, and Request for Permanent Injunction against Defendants Andrew Sherman, ("Sherman"), Terves, Inc. ("Terves"), and James Huddleston ("Huddleston"), and, in support thereof, allege:

**I.      NATURE OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS**

1.      This is a computer fraud and abuse and misappropriation of trade secrets case. Defendants Sherman and Terves hired a computer hacker (known online as "GreenTurtle") to hack into the computer network of Bubbletight in order to steal the trade secrets of Plaintiffs. Having succeeded, Terves and Sherman (with the assistance of Defendant Huddleston) are now commercially exploiting for their own benefit the trade secrets and other information of Plaintiffs that was stolen.

2.      Plaintiff APS is a manufacturer and leading innovator of metal composites. Since 2006, APS has spent nine years of intensive and costly research and development, and has developed seventy-five variations of proprietary, dissolving, metal composites to be used in making down-hole tools for various applications. The first of these down-hole tools to reach market was a dissolving metal frac-ball, in the summer of 2011. Frac-balls are injected into an oil and gas well during the hydraulic fracture stimulation process.

3.      Hydraulic fracture stimulation involves the injection of liquids at high pressures down-hole to create cracks in underground formations to allow oil and gas to flow more easily to the surface. In horizontal wells, there are generally multiple phases (or frac zones) of hydraulic fracture stimulation, as cracks are created along the length of the horizontal well-bore underground. Once the first stimulation is completed, and cracks are created into the formation, it is necessary to plug the first frac-zone to allow sufficient pressure to build up to create cracks in the second frac-zone. This is repeated in sequence for up to fifty-four frac-zones in one horizontal oil drilling. One method used by oil and gas operators to build up this pressure is the use of frac-balls, which are balls of various diameters sent down-hole to seal off each frac-zone, usually starting from smallest diameter and increasing to largest diameter as the stimulation process moves from the end of the horizontal wellbore towards the vertical wellbore. Other methods can use a single size instead of varying sizes across the zones.

4.      Traditionally, operators have used phenolic (plastic) frac-balls, which can only survive lower pressures and temperatures and which tend to shatter or get stuck in the borehole, resulting in costly delays in the stimulation process. The use of phenolic frac-balls also tends to result in additional costs to unplug the wellbore from clogged phenolic frac-balls once all stimulations are complete. APS's proprietary metal composites remedied these deficiencies by

maintaining higher strength even at elevated temperatures during the stimulation process, while also dissolving over time as they come into contact with various hydraulic fracture stimulation fluids. Thus, APS's proprietary metal frac-balls allow operators to increase pressures for deeper hydraulic fracture stimulations, increase flow rate post-stimulation and reduce delays/costs that accompanied the use of other types of frac-balls.

5.      APS partners with Plaintiffs Industrial Supply and Bubbletight to sell APS's metal dissolvable materials to oil and gas operators throughout the United States, including the State of Texas, with great success. Industrial Supply buys materials manufactured by APS, including the metal composites, which it then sells to others such as Bubbletight. Bubbletight, in turn, markets and sells metal composite products directly to its industrial consumers and clients. APS provides its proprietary compositions, product specifications, product certifications, testing information and QC data (physical and mechanical properties) for its metal materials to Industrial Supply and Bubbletight, pursuant to non-disclosure agreements to guard against any improper use or disclosure of APS's trade secrets.

6.      APS, however, is not alone in the metal down-hole tools market.

7.      Defendant Terves, Inc. (started in 2012) is a direct competitor of APS, and, on information and belief, has been trying to develop metal down-hole tools based on compositions that were made of sand, which were intended to dissolve away faster than other materials. Despite its best efforts through February 2015, however, Terves was unable to independently develop a single metal frac-ball material that could compete with APS's multiple materials in strength, performance, or dissolve rates. Rather than continue to expend the time and money to independently research and develop a dissolving metal material that could compete against APS's frac-ball, Terves's founder and president, Defendant Andrew Sherman, decided to

shortcut legitimate research and obtain APS's proprietary information illegally. Upon information and belief, in or around December 2014/January 2015, Sherman connected with Defendant James Huddleston, a consultant who previously consulted with APS under a confidentiality agreement, to discuss ways to obtain APS's proprietary metal composite technology. Armed with a strategy for obtaining APS's trade secrets, Sherman decided to procure the services of a hacker to steal APS's proprietary data.

8.       In or about January 3, 2015, Sherman approached and hired a hacker-for-hire commonly known as "GreenTurtle" to obtain APS's trade secrets by hacking into the electronic databases and e-mail servers of, not APS or its largest customer, but one of its other customers, Bubbletight. Indeed, Sherman specifically told GreenTurtle that he "must not attempt to obtain [APS's proprietary compositions and other information] directly from [APS's] present employees." Sherman requested that GreenTurtle locate the following APS information:

1) Material properties and compositions for material utilized in the dissolvable frac ball markets

2) Item 1 must have both the chemical composition and physical properties and spec parameters

3) All major customers within the Oil & Gas industry

4) Pricing of their material to customers or end item frac ball pricing

5) Major raw material suppliers especially of magnesium and vendors of services such as forging

6) A list of all the contacts you utilize for obtaining this information [as] it may be useful for me at a later date

Sherman told GreenTurtle that "[h]ow you get this information is up to you." In exchange, Sherman was "willing to pay any amount necessary to accomplish [GreenTurtle's] activities". Sherman paid GreenTurtle $40,000.00. upfront, and another $5,000.00 in February 2015 after GreenTurtle successfully hacked into Bubbletight's e-mail system and obtained APS's

proprietary compositions and other information listed above for its metal composite materials, as well as Bubbletight's proprietary customer and pricing information.

9.     Armed with APS's and Bubbletight's stolen proprietary information, Terves issued a press release on April 14, 2015, *a mere two months later*, announcing that it had "developed" a second-generation TervAlloy engineering disintegrating frac-ball of multiple compositions. *The summary provided by Terves of the latest TervAlloy materials used in its frac-balls was, performance wise, significantly different than what was claimed by Terves and Sherman in the past. The dissolution performance was identical to two compositions APS currently sold only by Bubbletight to one of its customers. The dissolve rates are 30 and 50 mg/cm2/hr which are identical to the compositions provided by Bubbletight to its customers. After further investigation, the compositions and specifications are in fact the one's GreenTurtle illegally obtained by hacking into Bubbletight's computer system, which he provided to Sherman and Terves.*

10.     Since April 2015, Terves has aggressively marketed its second generation TervAlloy to Plaintiffs' customers, making a simple, yet compelling, pitch that "we will provide you with an identical product at a lower price." Terves is only able to offer an identical product because it stole APS's compositions and specifications for its metal dissolvable tools/frac-balls; Terves is able to offer a lower price because it did not have to invest in research and development (instead spending only $45,000 to pay off the hacker). Terves is also armed with Bubbletight's confidential customer pricing information which enables it to undercut Bubbletight.

11.     Since January 2015, Bubbletight has lost several million dollars in sales of APS's frac-balls as its customers switched from purchasing APS's metal frac-balls in favor of Terves's

cheaper, but stolen frac-balls. As Bubbletight has lost sales, it has purchased fewer frac-balls from Industrial Supply, which likewise has ordered less metal composites from APS, damaging all Plaintiffs to the tune of millions of dollars in lost profits.

12.     The loss of APS's and Bubbletight's proprietary information by GreenTurtle's illegal hack of Bubbletight's computer system is also causing both APS and Bubbletight to suffer imminent and irreparable harm for which they have no adequate remedy at law in that their trade secrets have been misappropriated by, and continue to be used by, a direct competitor. Unless Terves and Sherman's misappropriation of APS's and Bubbletight's trade secrets is enjoined, APS, Industrial Supply and Bubbletight will continue to suffer irreparable harm as Terves continues to use APS's trade secrets to develop additional competing products to undermine APS's, Industrial Supply's, and Bubbletight's businesses and goodwill.

13.     Therefore, Plaintiffs have been forced to file this suit to ensure the return of APS's and Bubbletight's proprietary and trade secret information, to enjoin Defendants (and their distributors) from continuing to use, disclose, and commercially exploit APS's and Bubbletight's trade secrets, which is causing APS and Bubbletight imminent and irreparable harm, and to recover their lost profits and disgorge Defendants of their ill-gotten gains.

## II.     THE PARTIES

14.     **Plaintiff APS.** APS is a Texas Corporation with its principal place of business in Harris County, Texas.

15.     **Plaintiff SWM Enterprise, LLC d/b/a Industrial Supply Company.** Industrial Supply is a Texas limited liability corporation with its principal place of business in Harris County, Texas.

16.     **Plaintiff Bubbletight.** Bubbletight is a Texas limited liability corporation with its principal place of business in Fort Bend County, Texas.

6

17.     **Defendant Sherman.** Sherman is a resident of Ohio. Sherman is the founder and president of Terves. Upon information and belief, Sherman engages in continuous and systematic activities in the State of Texas. Furthermore, Sherman has committed intentional torts in Texas as alleged herein. This lawsuit arises from Sherman's torts committed within the State of Texas. Sherman can be served under the Texas Long Arm Statute with process through the Texas Secretary of State by forwarding service to 9181 Boyer Lane, Mentor, Ohio 44060-7916.

18.     **Defendant Terves.** Terves is a Nevada Corporation with its principal place of business in Ohio. Upon information and belief, Terves engages in continuous and systematic activities in the State of Texas, but has not registered to do business in Texas nor designated a registered agent for service of process in Texas. Further, Terves has committed in torts in Texas as alleged herein. This lawsuit arises from Terves's torts committed within the State of Texas. Terves can be served under the Texas Long Arm Statute with process through the Texas Secretary of State by forwarding service to its registered agent in Ohio, Terves, Inc., 24112 Rockwell Drive, Euclid, Ohio 44117.

19.     **Defendant Huddleston.** Huddleston is a resident of Texas. He can be served with process at 1431 Overhill Street, Houston, Texas 77018.

### III.     JURISDICTION AND VENUE

20.     This action arises under federal law, specifically the Computer Fraud and Abuse Act [18 U.S.C. § 1030] and the Stored Wire and Electronic Communications and Transactional Records Access Act [18 U.S.C. § 2701, *et. seq.*], and as such this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331. This action also arises under the Court's supplemental jurisdiction over Plaintiffs' state law claims, under 28 U.S.C. § 1367.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the

Southern District of Texas, as Defendants have, among other things, solicited Plaintiffs' customers, used APS's and Bubbletight's proprietary information, and / or generated revenue from sales of frac-balls designed using APS's proprietary specifications and information in the Southern District of Texas.

## IV.    FACTS

22.    As mentioned above, this lawsuit concerns Defendants' misappropriation of APS's and Bubbletight's trade secrets through the use of computer hacking to create a virtually identical, if not identical, metal frac-ball sold at a price just below that charged by Bubbletight for metal frac-balls manufactured by APS, which has caused APS (the manufacturer of the frac-ball), Industrial Supply (wholesaler), and Bubbletight (distributor). Defendants' unlawful conduct has caused Plaintiffs to suffer to suffer imminent and irreparable harm for which there is no adequate remedy at law. Defendants have stolen Plaintiffs' trade secrets and are using the trade secrets and other information unlawfully obtained to destroy the value of Plaintiffs' trade secrets and customer goodwill, for which no amount of money can fully and adequately redress. Nonetheless, to date, Plaintiffs have suffered millions of dollars in lost profits as a result of Defendants' unlawful conduct.

### A.    APS's VALUABLE TECHNOLOGY.

23.    APS, founded in 2003, is a manufacturer and leading innovator of metal composites using a process called chemical vapor deposition. Over the years, APS has done substantial work for the military and aerospace industry designing these metal composites for such applications as radiation-hardened shielding for missiles and rockets, as well as super-hard and super-light alloys for use on the F-35 joint strike fighter. APS routinely performs work in conjunction with large private-sector military contractors such as Raytheon, BAE Systems, and Lockheed Martin. In light of the sensitive nature of the bulk of APS's work in the defense

industry, the compositions of metal composites designed by APS are considered highly confidential, and subject to numerous restrictions on their transfer to third-parties, such as overseas manufacturers, under International Traffic in Arms Regulations.

24.     Around 2006, APS began work on expanding the civilian applications of its research and development of metal composites to the oil and gas industry by developing dissolving metal composites to be used to make down-hole drilling and completion tools. The first such tool that APS brought to market was a dissolving metal frac-ball in 2011.

25.     Frac-balls are injected into an oil well to block or close off portions in order to allow pressure to build up during each stage of the hydraulic fracture stimulation process. Before APS invented the dissolving metal frac-ball, frac-balls were constructed using various plastics; the idea being that the relatively lightweight phenolic (plastic) ball ultimately would be carried to the surface on a geyser of gas or oil. Unfortunately, the plastic balls would either shatter under the pressure, soften under the extreme temperatures, or get stuck in the borehole, resulting in costly delays. Thus, the industry needed a product that was stronger than plastic, but would be easier to remove from the wellbore. APS's metal dissolving composites met both requirements, providing operators with a customizable frac-ball that could dissolve in a specific amount of time in order to accommodate particular fracture stimulation parameters. In short, APS's metal frac-balls were customizable, stronger, dissolvable, and more effective than industry-standard plastic frac-balls. APS's metal composite frac-balls have revolutionized the industry, rendering plastic balls virtually a thing of the past.

26.     APS's success did not come without a cost. It took years of painstaking research and development and hundreds of thousands of dollars in expenditures to design a new metal

composite dissolving frac-ball, including hundreds of hours of designing, manufacturing concepts, testing, and tweaking compositions before APS was able to arrive at its final product.

**B.     APS'S SECURITY MEASURES.**

27.     APS's efforts to design its successful frac-balls were also undertaken with the utmost discretion and confidentiality. As a defense sub-contractor, APS takes extensive measures to protect not only the information it acquires for completing its contracts, but also its valuable proprietary research and development files, testing parameters, metal compositions, and specifications.

28.     Indeed, APS uses no subcontractors whatsoever to assist with the design, manufacture, or testing of its products, including its frac-balls. APS produces all its metals at a single facility in north Harris County, Texas. APS also requires all employees to sign a non-disclosure agreement promising to protect APS's trade secrets. Further, APS's electronic information is kept on a single, password-protected computer, and APS's run sheets are kept in a secure room under video surveillance. In sum, APS accords its development of metal composites for civilian applications substantially the same protection and confidentiality as it does its designs for military applications.

**C.     APS'S DISTRIBUTION NETWORK**

29.     APS has partnered with Industrial Supply and Bubbletight to sell and market APS's tailored performance metal composite materials to oil and gas operators throughout the United States, including the State of Texas, with great success. Industrial Supply, a wholesaler, buys products manufactured by APS, including the metal composites, which it then sells to Bubbletight. Bubbletight, a distributor, in turn, markets and sells APS's materials directly to industrial consumers and clients.

30.     Pursuant to this partnership, and in line with its extensive efforts to protect its research and development investment, APS provide its proprietary and trade secret composition and tolerances for its metal composite frac-balls to Industrial Supply and Bubbletight pursuant to non-disclosure agreements to guard against any improper use or disclosure of APS's trade secrets.

**D.     APS'S COMPETITOR, TERVES, FAILS TO DEVELOP A COMPETING FRAC-BALL**

31.     APS is not alone in the dissolving metal composite down-hole tools market. Indeed, as APS was successfully developing, testing, and ultimately distributing its metal composites, Terves, one of APS's competitors in developing metal down-hole tools, was unable, despite its best efforts, to develop a competing frac-ball.

32.     Rather than continue to perform independent research and development, Terves decided to shortcut legitimate research and obtain APS's proprietary compositions and tolerances for its metal composite frac-balls by improper means.

33.     In light of the substantial steps APS takes to protect its trade secret information, the only hope Terves had to obtain APS's proprietary composition and tolerance data was by way of illicit activity.

**E.     SHERMAN WORKS WITH HUDDLESTON TO TARGET APS'S PROPRIETARY TECHNOLOGY.**

34.     On information and belief, in or around December 2014, Sherman reached out to Huddleston, a consultant who formerly worked with APS pursuant to a confidentiality agreement and who is intimately aware of APS's confidential marketing strategies, research and development, and other business information, to discuss how best to target an improper acquisition of APS's proprietary frac-ball technology.

**F.      SHERMAN HIRES GREENTURTLE TO STEAL APS'S TRADE SECRETS.**

35.      In or about January 2015, after speaking with Huddleston, Sherman, Terves's founder and president, hired GreenTurtle to steal APS's information pertaining to its dissolvable metal composite tools.

36.      GreenTurtle, a hacker-for-hire, operates a website on the dark web called Rent-A-Hacker. On his website, GreenTurtle describes what he is willing to do:

> I'll do anything for money, I'm not a pussy : ) if you want me to destroy some business or a person's life, I'll do it! Some examples: simply hacking into something technically; causing a lot of technical trouble on websites / networks to disrupt their service with DDOS and other methods; economic espionage; getting private information from someone; ruining your opponents, business or private persons you don't like, I can ruin them financially and get them arrested, whatever you like. If you want someone to get known as a child porn user, no problem.[1]

37.      On January 3, 2015, Sherman made the following initial request to GreenTurtle:

> A past contact of mine got me access to your site. I would like to contract some information gathering services. How you get this information is up to you and discretion is of the upmost concern. I am will [sic] to pay any amount necessary to accomplish your activities as well as ensure that neither one of us can be linked or implicated. Below is a list of what the information I need help in obtaining. [sic] The company I need the information from is APS (Advanced Powder Solutions). however you must not attempt to obtain it directly from them their present employees or their biggest customer BOT (Baker Oil Tools). It may be possible to look at some of their other customers, supplier or past employees.
>
> 1) Material properties and compositions for material utilized in the dissolvable frac ball markets
>
> 2) Item 1 must have both the chemical composition and physical properties and spec parameters
>
> 3) All major customers within the Oil & Gas industry

---

[1] Copies of screenshots from GreenTurtle's dark-website are attached hereto as **Exhibit "1."**

> 4) Pricing of their material to customers or end item frac ball pricing
>
> 5) Major raw material suppliers especially of magnesium and vendors of services such as forging
>
> 6) A list of all the contacts you utilize for obtaining this information it may be useful for me at a later date

38.     GreenTurtle responded the next day, January 4, 2015, informing Sherman that he could complete the listed actions within thirty days, stating his price of $40,000 upfront plus an additional $5,000 upon completion of the work and warning Sherman of his non-negotiable terms including the following:

> If at any time before, during or after, this matter is discussed with any type of law enforcement agencies, I will ensure that you are destroyed professionally, personally, emotionally, financially, and most likely arrested on a wide variety of charges whether true or not. Believe me it will be the most unpleasant time of your life for years.

39.     On January 5, 2015, Sherman accepted GreenTurtle's terms and made the down payment. Based on information received from Sherman, Huddleston, and others, GreenTurtle focused his attacks on an APS distributor named Bubbletight.

40.     In or around January/early February 2015, GreenTurtle proceeded to hack into Bubbletight's computer systems, to steal APS's proprietary compositions and tolerances that Sherman and Terves could not independently develop. In fact GreenTurtle stole not one, but *three* proprietary compositions for APS's metal composites from Bubbletight.

41.     On February 4, 2015, GreenTurtle provided Sherman with the information he had stolen from APS and demanded payment pursuant to their prior arrangement:

> Attached is my final report. This will be the only contact you will receive from me unless I have missed information. Please send the final payment in the form and location agreed to. If payment is not received or I am discovered the ramifications will be enforced per the terms you agreed to.

The attachment to GreenTurtle's email lists the trade secret composition of the APS advanced material, its composition, testing parameters, mechanical properties, Bubbletight's major customers, and pricing information.[2]

**G.**   **HUDDLESTON ASSISTS TERVES AND SHERMAN IN COMMERCIALIZING THE STOLEN INFORMATION.**

42.   On information and belief, once Sherman had access to APS's and Bubbletight's trade secrets and once Terves had developed a virtually identical frac-ball, Huddleston began advising Terves and Sherman on how best to market their new stolen technology to customers using his intimate knowledge of APS's confidential business practices to assist Terves and Sherman in maximizing their profit potential from APS's and Bubbletight's stolen information.

43.   Just days later, on April 14, 2015, Terves issued a press release announcing its "second-generation TervAlloy engineered disintegrating frac balls." *The formulation summary provided by Terves to potential customers included the performance characteristics of the TervAlloy material, which is identical to the specifications GreenTurtle stole from Bubbletight and provided to Sherman.*

**H.**   **TERVES IS ATTEMPTING TO POACH PLAINTIFFS' CUSTOMERS AND OUTSOURCE ITS PRODUCTION TO CHINA.**

44.   Since April 2015, Terves has aggressively marketed TervAlloy to Plaintiffs' customers with, on information and belief, the assistance of Huddleston. Terves's pitch is simple and compelling: "we will provide you with an identical product at a lower price." Terves is only able to offer an identical product because it stole APS's compositions and specifications for its metal frac-balls, and Terves is only able to offer a lower price because it stole Bubbletight's pricing information, which Terves is now undercutting.

---

[2] A copy of this attachment will be made available to the Court for *in camera* inspection at a hearing on Plaintiffs' Application for a Temporary Restraining Order or for Preliminary Injunction.

45.     Since Terves began poaching Plaintiffs' customers, Plaintiffs have seen sales decline as customers move their business to Terves. Indeed, since January 2015, Bubbletight has lost several million dollars in sales of APS's frac-balls as its customers switched from purchasing APS's metal frac-balls in favor of Terves's cheaper, yet stolen, frac-balls. As Bubbletight has lost sales, it has purchased fewer metal composites from Industrial Supply, who likewise has ordered less material from APS, costing all of the Plaintiffs' millions of dollars in lost profits.

46.     The loss of APS's and Bubbletight's proprietary information by GreenTurtle's illegal hack of Bubbletight's e-mail system is also causing both APS and Bubbletight to suffer imminent and irreparable harm for which they have no adequate remedy at law in that their trade secrets have been misappropriated by, and continue to be used by, a direct competitor.

47.     Further, trends indicate that the next generation of oil and gas tool designs will be based off of dissolvable materials, like the metal composites designed and manufactured by APS. Terves now stands in a position to gain an unfair competitive advantage over Plaintiffs as it not only continues to produce an identical product that it misappropriated from APS, but also additional products using the proprietary technology it pilfered from APS. Unless Defendants' misappropriation of APS's and Bubbletight's trade secrets is enjoined, APS and Bubbletight will continue to suffer irreparable harm as Terves continues to use APS's and Bubbletight's trade secrets to develop additional competing products to undermine APS's and Bubbletight's businesses and goodwill.

48.     Moreover, the applications of APS's technology stolen by Terves are not limited to just the United States. APS has come to learn that Terves recently began discussions with a Chinese company in an effort to move Terves's manufacturing of metal composites to China. Terves's plan to move APS's stolen proprietary technology overseas presents not only further

irreparable harm to APS, as Chinese courts are notorious about not enforcing western intellectual property rights.

## V.    CAUSES OF ACTION

### A.    COUNT ONE – THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)

49.    Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

50.    Bubbletight's computers are used in interstate commerce and, therefore, are protected computers pursuant to 18 U.S.C. § 1030(e)(2)(B).

51.    GreenTurtle, on behalf of Defendants Terves and Sherman, knowingly and with intent to defraud, accessed Bubbletight's protected computers without authorization or in a manner exceeding any authorization he may claim that he had. By means of such conduct, GreenTurtle furthered the intended fraud and obtained APS's trade-secret information, which is of great value. *See* 18 U.S.C. § 1030(a)(4). GreenTurtle, on behalf of Defendants Terves and Sherman, also knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer. *See id.* § 1030(a)(5)(A). GreenTurtle, on behalf of Defendants Terves and Sherman, additionally intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage. *See id.* § 1030(a)(5)(B). GreenTurtle, on behalf of Defendants Terves and Sherman, further intentionally accessed Bubbletight's protected computer without authorization and, as a result of such conduct, caused damage and loss. *See id.* § 1030(a)(5)(C).

52.    Defendants Sherman, Terves, and Huddleston conspired with GreenTurtle to commit the offenses described above and, therefore, are also liable under the Computer Fraud and Abuse Act. *See id.* § 1030(b).

53.     More specifically, GreenTurtle hacked into Bubbletight's computer(s) and stole proprietary information pertaining to the dissolving metal frac-balls, specifications, product information, customers, pricing, and suppliers. GreenTurtle then sold the stolen information to Defendants Terves and/or Sherman. Defendants Terves, Sherman, and Huddleston then used the stolen information to manufacture and sell dissolving metal frac-balls and compete with Plaintiffs for Plaintiffs' own customers.

54.     Defendants' actions have caused loss to one or more persons (Plaintiffs) during any one-year period (from January 2015 to present) aggregating at least $5,000 in value. *See id.* at § 1030(a)(5)(B)(i), § 1030(g). Plaintiffs were forced to hire computer forensic experts to determine the extent of Defendants' bad conduct and incurred over $30,000.00 in so doing.

55.     Plaintiffs seek injunctive relief, as more fully described below, and money damages for Defendants' conduct in violation of the Computer Fraud and Abuse Act. Defendants' conduct impaired the integrity of Plaintiff's data and trade-secret information, resulting in loss of valuable trade-secret information, loss of customers, and loss of sales. Defendants' conduct caused further damage in usurping business opportunities of tremendous value to Plaintiffs. Accordingly, Defendants are liable for damages pursuant to 18 U.S.C. § 1030(g).

56.     All conditions precedent to Plaintiffs' successful assertion of this cause of action have been fully performed, satisfied, or waived.

**B.     COUNT TWO – THE STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS ACT (18 U.S.C. § 2701, *ET. SEQ.*)**

57.     Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

58.     GreenTurtle, on behalf of Defendants Terves and Sherman, intentionally accessed without authorization a facility which an electronic communication service for Bubbletight was provided and thereby obtained a wire or electronic communication while it was in electronic storage in such system.

59.     Plaintiffs have been aggrieved by GreenTurtle and Defendants Terves and Sherman's intentional misappropriation of APS's and Bubbletight's wire or electronic communications from Bubbletight's electronic communication service, and have suffered actual damages as a result of such misappropriation.

60.     Plaintiffs are entitled to recover their actual damages suffered as a result of such unlawful access, including any profits made by Defendants as a result of such unlawful access.

61.     Because Defendants Terves and Sherman willfully or intentionally accessed Bubbletight's electronic communication service without authorization using GreenTurtle, Plaintiffs are entitled to recover punitive damages from Defendants Terves and Sherman for such unlawful access.

62.     As a result of Defendants' unlawful access, Plaintiffs have had to incur the services of the undersigned counsel, and should be awarded their reasonable and necessary attorney's fees for pursuing this cause of action under 18 U.S.C. § 2707(c), together with their costs.

63.     All conditions precedent to Plaintiffs' successful assertion of this cause of action have been fully performed, satisfied, or waived.

**C.    CAUSE THREE – ACTUAL MISAPPROPRIATION OF TRADE SECRETS UNDER THE TEXAS UNIFORM TRADE SECRETS ACT ("TUTSA")**

64.     Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

65.     Section 134A *et. seq.* of the Texas Civil Practice and Remedies Code provides for monetary and injunctive relief for the misappropriation of trade secrets.

66.     Defendants have accessed, downloaded, used, and/or disclosed APS's and Bubbletight's trade secrets without APS's or Bubbletight's express or implied consent through the use of improper means, including GreenTurtle's illicit hacking of Bubbletight's electronic servers on behalf of Defendants Terves and/or Sherman.

67.     The information accessed, downloaded, retained, used, and/or disclosed by Defendants belongs to APS or Bubbletight, is valuable to APS and/or Bubbletight, is not to be disclosed outside APS or Bubbletight except by authorization, is not readily discoverable by proper means, and is the subject of reasonable efforts by APS and Bubbletight to maintain its secrecy.

68.     APS and Bubbletight therefore seek injunctive relief, money damages, exemplary damages, and attorney's fees for Defendants' conduct in violation of TUTSA. Pursuant to TUTSA § 134A.003, APS and Bubbletight seek injunctive relief to prevent future wrongful acts by the Defendants, as more fully described below.

69.     Defendants' misappropriation resulted in damages to APS and Bubbletight, including loss of valuable trade-secret information, loss of customers, and loss of sales. Accordingly, Defendants are liable for damages pursuant to TUTSA § 134A.004(a).

70.     Because Defendants' misappropriation was willful and malicious, APS and Bubbletight are entitled to exemplary damages and attorney's fees pursuant to TUTSA §§ 134A.004(b), 134A.005.

71.     All conditions precedent to APS's and Bubbletight's successful assertion of this cause of action have been fully performed, satisfied, or waived.

**D.    COUNT FOUR – UNJUST ENRICHMENT**

72.    Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

73.    APS's and Bubbletight's proprietary information stolen by GreenTurtle on behalf of Defendants are valuable assets of APS and Bubbletight, and provide Plaintiffs with economic advantage.

74.    Terves would be unjustly enriched if it is permitted to obtain an unfair competitive advantage, monetary benefits, or other business value from its unlawful acts, including profits from the sale of Terves's substantially similar frac-ball developed using APS's stolen proprietary information, to the detriment of Plaintiffs.

75.    Plaintiffs are therefore entitled to recover from Terves the improper profits that Terves has received as a result of such unlawful activity. Plaintiffs further request that the Court place such improper profits received by Terves into a constructive trust for the benefit of Plaintiffs.

76.    All conditions precedent to Plaintiffs' successful assertion of this cause of action have been fully performed, satisfied, or waived.

**E.    COUNT FIVE – ACCOUNTING**

77.    Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

78.    Terves has profited from its unlawful activity by selling competing products to APS's metal composite frac-ball, which were designed using APS's proprietary technology, at prices that incorporate Bubbletight's proprietary pricing information.

79.     Plaintiffs therefore seek a judicial accounting of Terves's profits from the sale of its frac-balls, or any other product or service developed using APS's stolen proprietary technology, or priced using Bubbletight's proprietary pricing information.

80.     All conditions precedent to Plaintiffs' successful assertion of this cause of action have been fully performed, satisfied, or waived.

**F.     COUNT SIX – CIVIL CONSPIRACY**

81.     Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

82.     On information and belief, GreenTurtle, Defendants Terves, Sherman, and/or Huddleston entered into an agreement to accomplish an unlawful object, purpose or course of action and/or to accomplish a lawful object, purpose, or cause of action by unlawful means. Defendants and/or GreenTurtle took one or more unlawful, overt acts, in furtherance of their agreement, including, among other things, the unlawful misappropriation of APS's and Bubbletight's proprietary information in violation of the Computer Fraud and Abuse Act, the Stored Wire and Electronic Communications and Transactional Records Access Act, and the Texas Uniform Theft of Trade Secrets Act.

83.     Plaintiffs have suffered damages as a proximate result of Defendants and GreenTurtle's overt acts in furtherance of their agreement.

84.     Defendants are jointly and severally liable for all damages flowing from the conspiracy, including all damages, such as lost profits, suffered by Plaintiffs as a result of Defendants' and GreenTurtle's misappropriation of APS's and Bubbletight's proprietary information, which were accomplished in furtherance of the conspiracy. As such, Plaintiffs are entitled to recover all damages from Defendants, jointly and severally, for each of their causes of

action asserted herein for Defendants and GreenTurtle's overt acts undertaken in furtherance of their conspiracy, including Plaintiffs' reasonable and necessary attorney's fees.

85.     All conditions precedent to Plaintiffs' successful assertion of this cause of action have been fully performed, satisfied, or waived.

**G.     INJUNCTIVE RELIEF**

86.     Plaintiffs incorporate by reference herein the allegations set forth in the above-referenced paragraphs.

87.     Plaintiffs have demonstrated above that they have a probable right to success on the merits of this case. Indeed, Defendants' deplorable tactics and egregious thievery cannot be disputed.

88.     If Defendants are allowed to take advantage of their illegal conduct, compete with Plaintiffs, and/or move their manufacturing to China, Plaintiffs will be irreparably injured for which there is no adequate remedy at law. Plaintiffs are already threatened with the loss of significant additional business, the value of which cannot be precisely calculated at this time. Moreover, Defendants can hardly be said to be at risk of damage if an injunction is granted against them. Defendants have no legal right to use the trade secret and proprietary information they stole from APS and Bubbletight; they have no legal right to poach Plaintiffs' customers; they have no legal right to transfer APS's trade secrets to a country known for ignoring the proprietary rights of Westerners; and they certainly have no legal right to profit from their illicit actions.

89.     The public interest would be best served by the issuance of the injunctive relief Plaintiffs seek because Defendants' actions are destructive to the sound and productive business practices that fuel a healthy economy.

90.     As such, Plaintiffs seek a temporary restraining order, a preliminary injunction, and, upon final judgment, a permanent injunction, against Defendants:

- Prohibiting Defendants from using, disclosing, transferring, or commercially exploiting any information, including electronic communications, obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems without authorization or in a manner exceeding any authorization, including, but not limited to, any information obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems (whether obtained directly or indirectly through the use of any third party, including but not limited to "Green Turtle");

- Prohibiting Defendants from using, disclosing, transferring, or commercially exploiting any confidential information or trade secrets of APS or Bubbletight. For purposes of this relief, the term "confidential information or trade secrets of APS or Bubbletight" means and refers to all non-public confidential or proprietary information of APS or Bubbletight that embodies or relates to APS or Bubbletight's non-public know-how, inventions, product roadmaps, product development plans or strategies, material compositions, testing parameters or procedures, specifications, formulas, R&D portfolio, ideas, discoveries, or data such as non-public developmental, technical, engineering, marketing, sales, customers, pricing, contracts, profits, operations, performance, costs, manufacturing, business or process information. This term also includes any non-public information of APS or Bubbletight related in any way to APS's metal composites, including its metal composite frac-balls;

- Prohibiting Defendants from deleting, altering, destroying, or removing any emails, documents, data, information, electronic postings, social media, text messages, voicemails, records, files, history data or properties, relating in any way to the facts or claims asserted in Plaintiffs' Complaint; any access to APS or Bubbletight's computers, e-mail servers, or other electronic storage systems without authorization or in a manner exceeding any authorization; any information obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems (whether obtained directly or indirectly through the use of any third party, including but not limited to "Green Turtle"); or Terves's, Sherman's, or Huddleston's development, marketing, or sales of any metal composite based in whole or in part on APS's compositions, specifications, tolerances, or other information, including metal composite frac-balls;

- Prohibiting Defendants from selling any metal composite frac-balls, or any other product, derived in whole or in part from the confidential information or trade secrets of APS or Bubbletight or from any information, including electronic communications, obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems without authorization or in a manner exceeding any authorization, including, but not limited to, any information obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems (whether obtained directly or indirectly through the use of any third party, including but not limited to "Green Turtle");

- Prohibiting Defendants from soliciting any of Plaintiffs' customers to purchase any metal composite frac-balls (including Terves's TervAlloy frac-balls), or any other product, derived in whole or in part from the confidential information or trade secrets of APS or Bubbletight or from any information, including electronic communications, obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems without authorization or in a manner exceeding any authorization, including, but not limited to, any information obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems (whether obtained directly or indirectly through the use of any third party, including but not limited to "Green Turtle");

- Prohibiting Defendants from developing any products or services derived in whole or in part from the confidential information or trade secrets of APS or Bubbletight or from any information, including electronic communications, obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems without authorization or in a manner exceeding any authorization, including, but not limited to, any information obtained from APS's or Bubbletight's computers, e-mail servers, or other electronic storage systems (whether obtained directly or indirectly through the use of any third party, including but not limited to "Green Turtle"); and,

- Ordering Defendants to return and destroy all copies of the confidential information and trade secrets of APS and Bubbletight, as well as any information of APS or Bubbletight stolen by GreenTurtle, subject to the verification of an independent third-party forensic examiner chosen by the parties.

## VI.  DEMAND FOR JURY TRIAL

91.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on any issues so triable.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Advanced Powder Solutions, Inc., Bubbletight, LLC, and SWM Enterprises, LLC d/b/a Industrial Supply Company respectfully request that Defendants Andrew Sherman, Terves Inc., and James Huddleston be cited to appear and answer and that this Court award the following:

- judgment against Defendants and in favor of Plaintiffs with respect to Plaintiffs' Original Complaint;

- monetary damages to Plaintiffs for Defendants' violation of the Computer Fraud and Abuse Act;

24

- monetary damages to Plaintiffs for Defendants' violation of the Stored Wire and Electronic Communications and Transactional Records Access Act;

- monetary and exemplary damages to Plaintiffs for Defendants' violation of the Texas Uniform Trade Secrets Act;

- an accounting of for all sales made by Terves using the confidential information or trade secrets of APS and Bubbletight, including all sales of Terves's TervAlloy frac-balls;

- disgorgement of all profits/ill-gotten gains by Defendants from the misappropriation or use of the confidential information or trade secrets of APS and Bubbletight, including all sales by Terves of Terves's TervAlloy frac-balls;

- costs, expenses, and attorneys' fees to Plaintiffs;

- injunctive relief against Defendants as described above, first in a manner of a temporary restraining order, then as a preliminary injunction, and finally as a permanent injunction;

- pre- and post-judgment interest as provided by law; and

- such other and further relief to which Plaintiffs may be justly entitled.

Date: July 24, 2015                    Respectfully submitted,

                                       BAKERHOSTETLER LLP

                                       By: */s/ Edward L. Friedman*
                                              Edward L. Friedman
                                              State Bar No. 07462950
                                              Federal Bar No. 72833
                                              efriedman@bakerlaw.com
                                              811 Main Street, Suite 1100
                                              Houston, Texas 77002
                                              Telephone: 713.751.1600
                                              Facsimile: 713.751.1717

                                       ATTORNEY FOR PLAINTIFFS ADVANCED POWDER
                                       SOLUTIONS, INC., BUBBLETIGHT, LLC, AND SWM
                                       ENTERPRISE, LLC D/B/A INDUSTRIAL SUPPLY
                                       COMPANY