IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ADVANCED POWDER SOLUTIONS, INC., BUBBLETIGHT, LLC, AND SWM ENTERPRISES, LLC D/B/A INDUSTRIAL SUPPLY COMPANY, | § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 4:15-cv-02128 |
| v. | § § | |
| ANDREW SHERMAN, TERVES INC., AND JAMES HUDDLESTON, | § § § § | |
| *Defendants.* | § | |

## DEFENDANTS' RESPONSE TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MOTION TO DISSOLVE EX-PARTE TEMPORARY RESTRAINING ORDER

Defendants Andrew Sherman ("Sherman") and Terves Inc. ("Terves") (collectively the "Defendants") file this Response to Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction and Emergency Motion to Dissolve Ex-Parte Temporary Restraining Order (the "Motion") obtained by Plaintiffs Advanced Powder Solutions, Inc., ("APS"), Bubbletight, LLC ("Bubbletight"), and SWM Enterprises, LLC d/b/a/ Industrial Supply Company ("ISC") (collectively the "Plaintiffs") on July 24, 2015 (Doc. 6). Defendants request that this matter be heard at the previously set scheduling conference before this Court at 2:00 p.m. on Wednesday, August 5, 2015. (Doc. 6). Defendants have provided sufficient notice to Plaintiffs to permit such a hearing.[1]

---

[1] On Friday, July 27, 2015, counsel for Defendants informed counsel for Plaintiffs that they would be moving to dissolve Temporary Restraining Order pursuant to Rule 65(b)(4), which requires two-days' notice.

---

## I.    Summary of the Argument

Plaintiffs obtained an ex-parte temporary restraining order based on sensational allegations that have no basis in reality. Plaintiffs' allegations that Defendants (1) have employed clandestine and surreptitious computer-hacking to obtain Plaintiffs' "secret formula;" and (2) then put that formula to use in Defendants' products are both ***false***, and demonstrably so.   Terves developed its TervAlloy product ***last year***, and that formula and manufacturing process has not changed since October 2014, long before this alleged computer intrusion by the alleged "Green Turtle."   Terves is a respected industry participant with a strong track record of innovation and success developing new products.  Declaration of Andrew Sherman attached as Exhibit A ("Sherman Decl., Ex. A"), ¶2-6. Defendants have never, and would never, pay a hacker to obtain Plaintiffs' information.  Furthermore, other than rank hearsay from a private investigator, there is no evidence of any interactions between "Green Turtle" and Andrew Sherman, other than bizarre text files that could easily be fabricated by any user with basic word processing skills. Declaration of Roy Rector attached as Exhibit E ("Rector Decl., Ex. E"), ¶¶9–10. On this evidence alone, Plaintiffs sought and obtained ex-parte relief. Forensic examination of Andrew Sherman's laptop and email, however, failed to locate any evidence that Mr. Sherman had ever visited any "rent-a-hacker" website or had communicated sent or received any emails from the "Green Turtle." *Id.*, ¶¶9–10.

Furthermore, Defendants have not used Plaintiffs' so-called proprietary information.  Terves uses a casting process for its frac-balls and Plaintiffs' use a powder-based method.  Critically, Plaintiffs have no proof that Defendants have changed their manufacturing process in any way using Plaintiffs' trade secrets, because

they have not.  Doud Decl., Ex. B, ¶13.  Furthermore, Defendants have no plans to "move to China," or anywhere else.  In fact, it appears that, other than basic industry background, almost everything stated under oath to this Court by Plaintiffs is untrue. These "facts" are pure conjecture and cannot sustain a temporary injunction and Defendants respectfully request dissolution of the Temporary Restraining Order immediately, as these groundless allegations are causing significant harm to Defendants' business.

## II.     Relevant Facts

Defendant Terves[2] is a cutting-edge materials science company that produces engineered composites used in the oil and gas well completion and defense industries. The company has developed a number of proprietary, patented, and proven core technologies, one of them being the recently developed TervAlloy product, finalized in 2014.  Sherman Decl., Ex. A, ¶¶2–6; Declaration of Brian Doud attached as Exhibit B ("Doud Decl., Ex. B"), ¶¶8, 11–12. The company primarily produces tubular products but TervAlloy can also be used to create, among other things, dissolving frac-balls. Sherman Decl., Ex. A, ¶7; Doud Decl., Ex. B, ¶¶8–9.  Andrew Sherman is the founder and Chief Technology Officer of Terves, as well as its Chief Executive Officer.  Sherman Decl., Ex. A, ¶1.

Mr. Sherman has been active in the research, development, and commercialization of advanced materials for over 31 years.  *Id.,* ¶2.  He is a fellow of the Advanced Society of Metals, and a member of: (1) the American Ceramic Society; (2) the Materials Society; (3) the American Institute of Aeronautics and Astronautics; and (4) a lifetime member of the National Defense Industries Association.  *Id.*  Mr.

---

[2] Pronounced "Ter-veys."

Sherman has been awarded: four NorTec Innovation awards (given to the best new technology breakthroughs); the Wall Street Journal's "Tech Genius" award; the National Association of Corrosion Engineering's and the American Metals Market "Technology of the Year Award," and he has been recognized with three R&D 100 awards.  *Id.,* ¶¶3–4. A more complete list of Mr. Sherman's accomplishments in the development and utilization of advanced metals and materials for the oil and gas and defense industries is included in his declaration attached to this Motion.  *Id.,* ¶¶2–6.

Terves finalized the development of TervAlloy in 2014.  Sherman Decl., Ex. A, ¶8.  TervAlloy is a breakthrough, dissolvable material and can be formed into frac-balls, and other tools, for well completions.  *Id.*  Unlike previous frac-ball products, TervAlloy does not start degrading during the ball drop insertion phase, and only begins to dissolve when exposed to certain completion fluids. Doud Decl., Ex. B, ¶8. Once specific completion fluids come into contact with TervAlloy frac-balls, the frac-balls begin to dissolve over a pre-set time until completely disintegrated, leaving an unobstructed wellbore.  *Id.*

TervAlloy frac-balls are manufactured through a casting process, by melting Defendants' own proprietary nanocomposite metallic material and pouring it into molds. *Id.,* ¶13. This is completely different than Plaintiffs' method of forming encapsulated powder, which they call degradable composite metal ("DCM"). *Id.,* ¶23. The primary benefit of Defendants' molding/extrusion method is that TervAlloy can be produced for a lower cost than DCM.  Even Plaintiffs admit this is a different process, as Plaintiff Bubbletight touts the alleged benefits of its DCM manufacturing method as opposed to extruded alloys (such as TervAlloy) on its own website.  *See* Ex. C. (Comparing DCM's

tensile strength and resistance to elongation with extruded alloys, such as TervAlloy).

Price matters in this market, however, and cost-efficiency is paramount to success since

the fall in oil prices.  In fact, TervAlloy was awarded the Frost & Sullivan "Best New

Industrial Technology" award in 2014, and it is currently a finalist for an R&D 100 award

in both the materials and the disruptive innovation categories.  Sherman Decl., Ex. A,

¶4.

The latest generation of the "TervAlloy" material was formulated in May 2014.

Doud Decl., ¶¶16, Ex. 1. Using that recipe, it was first produced for a customer on

September 24, 2014. *Id.*, ¶15. Since that date, TervAlloy's formula and manufacturing

process has not changed and the current specifications of the product have been

marketed to customers since October 2014.[3] *Id.*, ¶19, Ex. 4; ¶17, Ex. 2, ¶18, Ex. 3, ¶21,

Ex. 7.

In 2014, Terves filed three separate patent applications related to the TervAlloy

material.  Specifically, Defendants filed the following:

- Application No. 61/942,879 on February 21, 2014, titled "Manufacture of controlled rate dissolving materials;"

- Application No. 61/942,870 on February 21, 2014, titled "Fluid actuated disintegrating metal system;" and

- Application No. 61/981,425 on April 18, 2014, titled "Galvanically-Active in situ formed particles for controlled rate dissolving tools."

In addition, Terves has been licensed a patent from its parent corporation,

Powdermet, Inc., from 2012 that relates to the manufacturing process of TervAlloy:

- Application No. 61/735,246 on October 12, 2012, titled "Material and Method to Manufacture for Engineered Reactive Matrix Composites."

---

[3] The customer brochures were tweaked in December 2014, as field results and additional testing results were slightly different than expected. *Id.*, ¶19, Ex. 5. The formula for the product, however, did not change. *Id.*, ¶13.

Doud Decl., Ex. B, ¶¶11-12.  Critically, Terves fully developed, manufactured, sold, and delivered TervAlloy long before Plaintiffs claim their computers were allegedly hacked by the so-called "Green Turtle."  *Id.*, ¶10; Sherman Decl., Ex. A, ¶8.

If the injunction is interpreted as a blanket shutdown order on Terves's shipments of its products, including its tubular products that are not mentioned in the Petition or Application for TRO ("Selling any metal composite frac-balls, or any other product,…"), the company will incur millions of dollars in lost sales and its relations with its customers will be permanently damaged.

### III.    Argument and Authorities

A temporary restraining order and preliminary injunction are remedies "that should only be imposed in extraordinary cases."  *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003) (reversing the grant of preliminary injunction when the likelihood of success cannot be shown).  The party seeking a TRO or preliminary injunction has the burden to show its entitlement to such extraordinary relief.  *Clark v. Prichard,* 812 F.2d 991, 993 (5th Cir. 1987).  To carry this burden, the movant has the burden to show all four requirements of an injunction, namely the movant must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Lake Charles Diesel*, 328 F.3d at 195-96.  The primary factor, of course, is the Court's determination that the plaintiff will likely succeed on the merits.  Here, Plaintiffs' case cannot come close to meeting this burden when the true facts of this case are exposed, and the extraordinary ex-parte relief they have obtained through these baseless allegations must be dissolved.

### A.    The ex-parte application procedurally violates Rule 65.

For an injunction to issue without notice to the defendants, the requirements of Federal Rule of Civil Procedure 65(b)(1)(B) must be met.  *Williams v. Owens*, No. 3:14-cv-2652-N, 2014 WL 4817700, *1 (N.D. Tex. Sept. 29, 2014).  Rule 65 requires that the attorney for the plaintiff certify in writing his or her "efforts made to give notice and the reasons why it should not be required."  FED. R. CIV. P. 65(b)(1)(B).  The rule therefore requires two things: (1) a certification of the efforts made to give notice to the defendants; and (2) an explanation of why such notice should not be required.  *Id.*

Instead of meeting the rule's requirements, Plaintiffs merely state that, "Plaintiffs are not aware of whether any of the Defendants are represented by counsel."  Doc. 3 at 19, ¶51.  This "certification" fails to meet either requirement of Rule 65 as it does not document what steps, if any, were taken and why the injunction must issue without notice.  Fed. R. Civ. P. 65(b)(1)(B).  Without following the proper steps of Rule 65, the TRO was procedurally infirm, and it should be dissolved on that basis alone.

### B.    The allegations in Plaintiffs' TRO application are baseless and demonstrably false.

Outside of the basic industry background for hydraulic fracturing, the allegations found in Plaintiffs' Original Petition (Doc. 1-1) and Application for TRO (Doc. 3) belong in pulp fiction.  Plaintiffs cannot meet their burden for the issuance of a TRO as all of the core allegations in these Plaintiffs' filings are false, and demonstrably so.  *Lake Charles Diesel,* 328 F.3d at 195-96.

Plaintiffs' case for injunction is built on four pillars.  First, Plaintiffs claim that Sherman hired a hacker to break into Bubbletlight's computers to obtain trade secret information on Plaintiffs' manufacturing methods.  *But see* Sherman Decl., Ex. A, ¶10;

Doud Decl., Ex. B, ¶4.   Second, Plaintiffs claim that Defendants took this information and have used it to begin manufacturing their frac-balls using the same process utilized by Plaintiffs, but at a cheaper price due to the lack of R&D investment.   *But see* Sherman Decl., Ex. A, ¶¶8-9; Doud Decl., Ex. B, ¶¶10, 23.   Third, Plaintiffs claim that Defendants are working with a third defendant, James Huddleston, an ex-insider to Plaintiffs, to accomplish this conspiracy.   *But see* Sherman Decl., Ex. A, ¶13; Doud Decl., Ex. B, ¶6.   Finally, Plaintiffs claim that Defendants have one foot out of the country and are planning to turn these trade secrets over to the Chinese.   *But see* Doud Aff., Ex. B, ¶24.   The reality is that all of these statements are false.   When the wave of reality washes in, Plaintiffs' TRO, like the cracked the pillars underneath it, must be dissolved.

**1.   Plaintiffs' allegations about the "Green Turtle" are careless, offensive, and completely untrue.**

Neither Terves, nor Andrew Sherman, have ever had any dealings with any hacker-for-hire.   Rector Decl., Ex. E, ¶¶9-10; Sherman Decl., Ex. A, ¶10; Doud Decl., Ex. B, ¶4.   Neither one of them hired the "Green Turtle," (if that even is a real person) nor anyone else for that matter, to hack into Plaintiffs' computers. *Id.* That warrants repeating—***neither Terves nor Mr. Sherman have ever hired a hacker to obtain Plaintiffs' information***. *Id.*

The documents supplied by Mr. Noukas in his affidavit appear to be a fabrication, and could easily be created by anyone with a basic understanding of word-processing. Sherman Decl., Ex. A, ¶12; Doud Decl., Ex. B, ¶5.   Defendants hired Roy Rector, a well-known and respected forensic examiner, to review Mr. Sherman's email account

and to perform a forensic search on his laptop computer, which he uses as his primary workstation. Rector Decl., Ex. E, ¶¶2-5.

Mr. Rector, using several searches taken from the documents attached to the Noukas Affidavit, was unable to find any trace of these files (whether existing or deleted) on Mr. Sherman's laptop or email. *Id.*, ¶¶7-10. Furthermore, Mr. Sherman's computer, email, and Internet history were searched for any reference to the "Royal Bank of Canada" - the bank that Plaintiffs claim was used to pay $45,000 in cash to the "Green Turtle," **none was found**.  Rector Decl., Ex. E, ¶¶7-10; Sherman Decl., Ex. A, ¶11; *see also*, Doud Decl., Ex. B, ¶7.  Also, there was no email from the "Green Turtle" in Mr. Sherman's email account on February 4, 2015 as the "Green Turtle" allegedly claims.  Rector Decl., Ex. E, ¶¶7-10; Sherman Decl., Ex. A, ¶10; *see also*, Doud Decl., Ex. B, ¶4..  Finally, Mr. Rector confirmed that there was **no evidence** on the laptop that Mr. Sherman had ever visited any "rent-a-hacker" website.  Rector Decl., Ex. E, ¶¶8-10.

Furthermore, Plaintiffs' story is inherently fishy.  They claim that some cut-throat, dark-net hacker-for-hire made $45,000 cash for one or two day's work and then, apparently overcome with remorse, randomly and out-of-the-blue, turned himself in to Plaintiffs' private investigator four months later?  That is less than credible.  This "Green Turtle" is, according to Plaintiffs, the same person who posted the following advertisement:

> I'll do anything for money, I'm not a pussy :) if you want me to destroy some business or a person's life, I'll do it!  Some examples…economic espionage, getting private information from someone, ruining your opponents, business or private persons you don't like, I can ruin them financially and get them arrested, whatever you like.  ***If you want someone to get known as a child porn user, no problem***.

Doc. 3 at 10 (emphasis added).  Plaintiffs' entire case relies upon the word of a person who specializes in framing innocent people with false allegations, including false allegations of pedophilia.  This is not the type of person whose word alone should be able to stall millions of dollars in sales of a legitimate and respected company.

Not only is this "Green Turtle" person far from credible, Plaintiffs have failed to submit any evidence from this person; instead, Plaintiffs expect this Court take a secondhand recap from Plaintiffs' investigator as gospel.  Sherman Decl., Ex. A, ¶13; Doud Decl., Ex. B, ¶4. In fact, Plaintiffs' own private investigator _created many of the documents_ submitted with his affidavit, replete with his own commentary.  _See_ Noukas Affidavit (Doc 3-2) at 7 ("Excerpt from the Rent-a-Hacker website (greenturtle). The website does not show dates for obvious reasons.  However, with GT's assistance, the dates have been shown from his own records.").  _See also Id._ at 11 ("Additional Questions.  This is what GT has provided based on questions pertaining to the previous information he shared.").  Therefore, Plaintiffs' proof is a private investigator's reporting of what some alleged hacker told him.  This is rank hearsay.  Plaintiffs' allegations make for a good read, but have no basis in reality.

> 2.     **Plaintiffs' claim that Defendants are using Plaintiffs' trade secrets to manufacture frac-balls is demonstrably false.**

Putting aside the wholly unsubstantiated claims of dark-net hackers-for-hire, the Plaintiffs' core complaint that Defendants are using Plaintiffs' research to manufacture frac-balls cannot survive even minimal scrutiny. Sherman Decl., Ex. A, ¶9. Plaintiffs claim that "Green Turtle" hacked into Plaintiffs' servers **_in January 2015_**.  Application at 4–5.  They then claim Defendants used Plaintiffs' information to develop the TervAlloy product quickly and cheaply, allowing them to undersell Plaintiffs with their own

technology.   Sherman Decl., Ex. A, ¶9. The allegations are unproven and, in fact, Tervalloy had already been developed and commercially sold by late 2014—before the alleged hacking incident.

### i. TervAlloy was developed before the alleged hack of Plaintiffs' servers

By the time of TervAlloy's official press release in April 2015, that product had already been in circulation and for sale to Terves's select customers for six months. Doud Decl., Ex. B, ¶¶10, 15, 20, Ex. 6; 21, Ex. 7.  The original "recipe" for TervAlloy's first generation of the product was completed in May 2014. Doud Decl., Ex. B, ¶¶8, 14, 16, Ex. 1. Terves soon developed a second generation, which is chemically the same, except the manufacturing process of the second generation product is done in larger batches then extruded into final form.  The second generation of the product was first sold to a customer in September 2014.  Doud Decl., Ex. B, ¶¶14-15.  Since that time to the present day, ***there have been no changes to the product***.  *Id.*, ¶15.  In 2014 alone, Terves applied for three patents related to the process to create the TervAlloy product.  *Id.*, ¶11.

Terves made no secret of its new breakthrough.  On October 15, 2014, Terves released a material safety sheet for the TervAlloy products. *Id.*, ¶17, Ex. 2. In October 2014, a brochure for the TervAlloy products was created and distributed to customers and current customers for the product. *Id.*, ¶19, Ex. 4.  In December 2014, this brochure was tweaked to reflect information obtained through further testing and customer feedback - but there was no change to the actual recipe of the product.  *Id.*, ¶19, Ex. 5. Plaintiffs' core allegation, that Defendants have taken Plaintiffs' information and

benefitted from that information to adjust their manufacturing process is ***wholly false***. Sherman Decl., Ex. A, ¶9.

The first paragraph of the press release that Plaintiffs cite as proof of the TervAlloy's recent "rollout" states on its face that TervAlloy was introduced in 2014. Doud Decl., Ex. B, ¶¶6, 20, Ex. 6. ("Terves Inc. announced that more than 500 of its second-generation TervAlloy engineered disintegrating frac-balls have been successfully deployed in horizontal frac completions in North America since their introduction in late 2014." (emphasis added). *Id.*, see also ¶21, Ex. 7. Plaintiffs, however, ***failed to attach the full press release*** and, by selectively quoting only a portion of the document, they hid that glaring issue with their case from this Court in their ex-parte filing.

In fact, in October 2014, Terves set up a booth at a Calgary trade show to tout its new TervAlloy product. *Id.*, ¶21. This is a picture of Terves's TervAlloy booth in October 2014, with the banners listing the  specifications of the TervAlloy product more than three months before Plaintiffs claim they were hacked. *Id.*, ¶21, Ex. 7. Plaintiffs' core claim that Defendants'' used Plaintiffs' information to develop TervAlloy is demonstrably false.

### ii.      TervAlloy is not made the same way as Plaintiffs' product

Furthermore, there is a fundamental difference in the manufacturing method between the frac balls made by the Plaintiffs and Defendants.  While both are used for downhole well completions, they are formed through different manufacturing methods. Doud Dec., Ex. B, ¶13.  TervAlloy frac-balls are manufactured through melting down the alloys and pouring them into molds, as opposed to Plaintiffs' method of forming encapsulated powder, which they call their degradable composite metal ("DCM").  *Id.*, ¶¶13-14.  The primary benefit of Defendants' method is that TervAlloy can be produced for a lower cost than DCM.  *Id.*, ¶23. Even Plaintiffs admit this is a different process as Bubbletight touts the alleged benefits of its DCM manufacturing method as opposed to extruded alloys (such as TervAlloy) on its own website.  See Ex. C (Comparing DCM's tensile strength and resistance to elongation with extruded magnesium-based alloys, such as TervAlloy).

Plaintiff has failed to present any competent evidence that Terves is using any of the ASP's manufacturing methods and recipes.  The mere fact that TervAlloy can be created at a fraction of the price of Plaintiffs' product is not evidence of misappropriation. Doud Decl., Ex. B, ¶23. Because of the stark differences in the products' manufacture, even if Defendants had Plaintiffs' information, which they do not, they could not use it without giving up the price advantage their TervAlloy product enjoys.

Furthermore, changing the manufacturing method to mimic Plaintiffs would require a complete re-tooling of Defendants' manufacturing process, which hasn't happened and Defendants have no plans to make any such change.  Doud Decl., Ex. B,

¶15.  In sum, there is no proof that Defendants are using any part of Plaintiffs "confidential information" to create TervAlloy which was already in commercial use before the alleged hack.  Sherman Decl., Ex. A, ¶9.

### 3.    Plaintiffs' remaining allegations are unravelling as well

Plaintiffs seem to have gone off half-cocked based on an anonymous alleged email from the "Green Turtle" on July 23, 2015.  Doc. 3-2 at 5.  The "Green Turtle" seems to have also told the Plaintiffs that James Huddleston, one of Plaintiffs' former insiders, was working with Defendants to put this whole "conspiracy" in play.  Doc. 1-1 at 11, ¶34.  In fact, no one from Terves including Mr. Sherman has had any contact with Mr. Huddleston, and would not recognize him if they saw him.  Sherman Decl., Ex. A, ¶13; Doud Decl., Ex. B, ¶6.

Mr. Huddleston agrees.  In response to the emergency discovery requests issued by Plaintiffs, Mr. Huddleston said the following:  "[Huddleston] does not, and has never had, any communication or contact with Sherman, Treves, and/or Green Turtle which relate to any matter made subject of this Lawsuit or otherwise."  Attached as Exhibit G is a true and correct copy of Defendant James Huddleston Responses to Plaintiffs' First Set of Expedited Request for Production to Defendant Huddleston, Request For Production No. 5.

That's not all.  The "Green Turtle" apparently gave the Plaintiffs another hot lead as to where they could find the banking information to prove that Mr. Sherman paid him $45,000.  Upon filing this suit, Plaintiffs subpoenaed Surety Financial Group, LLC ("SFG") seeking documents related to a Royal Bank of Canada account.  (Doc. 8).  After a few phone calls to the lawyer for SFG, they withdrew that subpoena.  Ex. D.  Even the

bank account that Plaintiffs claim was used to pay the hacker keeps changing making the allegations a moving target.  Furthermore, as stated before, the forensic examiners found no reference to any Royal Bank of Canada account on Mr. Sherman's laptop or email.  Rector Dec., Ex. E, ¶¶7, 9-10; Sherman Decl., Ex. A, ¶11; Doud Decl., Ex. B, ¶7.

### 4.      Defendants are not digging a hole to China

The final basis for Plaintiffs' injunction is their claim that the Defendants were about to turn over Plaintiffs' trade secrets to the Chinese.  Doc. 3 ("Terves's plan to move APD's stolen proprietary technology overseas presents not only [sic] further irreparable harm to APS, as Chinese courts are notorious about not enforcing western intellectual property rights.")

This allegation is made under oath in Dean Baker's affidavit, although no basis for that belief is given and it is basically stated as formed under "information and belief." *See* Doc 3-1 at 8, ¶7 ("APS has come to learn that Terves recently began discussions with a Chinese company in an effort to move Terves's manufacturing of metal composites to China.")  Treves has no plans to move its manufacturing to China. Doud Decl., Ex. B, ¶24.

Plaintiffs' "understanding" without specific and identified facts that support that understanding cannot support the issuance of injunction. *Marshall Durbin Farms, Inc. v. National Farmers Org. Inc.*, 446 F.2d 353, 357 (5th Cir.1971) (noting that courts are reluctant to issue an injunction where the moving party substantiates allegations on "information and belief.").

## **Prayer**

Plaintiffs filed this case based on unsubstantiated and baseless allegations from an alleged hacker but none of the facts relied upon by the Plaintiffs survive basic scrutiny.   Plaintiffs case is relies on rank hearsay, speculation, innuendo, and "information and belief," none of which cannot meet Plaintiffs' burden to sustain injunctive relief.   The TRO should be immediately dissolved and a hearing set to determine Defendants' damages for the issuance of a wrongful injunction.

Respectfully submitted,

Wesley G. Lotz
State Bar No. 24046314
wlotz@fulkersonlotz.com
Southern District I.D. No. 584646
FULKERSON LOTZ LLP
700 Louisiana Street, Suite 5200
Houston, Texas 77002-2773
Telephone:   713.654.5800
Facsimile:    713.654.5801

ATTORNEY-IN-CHARGE FOR DEFENDANTS
ANDREW SHERMAN AND TERVES INC.

OF COUNSEL:
Jerry L. Mitchell
State Bar No. 14214650
Southern District I.D. No. 12653
Email: jmitchell@fulkersonlotz.com
Ethan G. Gibson
State Bar No. 27073131
Southern District I.D. No. 1145802
FULKERSON LOTZ LLP
700 Louisiana Street, Suite 5200
Houston, Texas 77002-2773

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on counsel of record in accordance with the Federal Rules of Civil Procedure vi the District Court's Case Management/Electronic Case Filing System on August 3, 2015.

Edward L. Friedman               efriedman@bakerlaw.com
BAKERHOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone:   713.751.1600
Facsimile:    713.751.1717

ATTORNEY FOR PLAINTIFFS

Xerxes (Zak) K. Patel           zak@zakpatellaw.com
THE ZAK K. PATEL LAW FIRM, PLLC
4141 Southwest Freeway, Suite 250
Houston, Texas 77027
Telephone:   713.570-6000
Facsimile:    832.514.7046

ATTORNEY FOR DEFENDANT
JAMES HUDDLESTON

*Wesley G. Lotz*

—————————————————————
Wesley G. Lotz