IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **ADVANCED POWDER SOLUTIONS, INC., BUBBLETIGHT, LLC, AND SWM ENTERPRISES, LLC D/B/A INDUSTRIAL SUPPLY COMPANY,** § § § § § *Plaintiffs*, § § **v.** § § **ANDREW SHERMAN, TERVES INC., AND JAMES HUDDLESTON,** § § § § *Defendants*. § | CIVIL ACTION NO. 4:15-CV-02128 |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISSOLVE THE EX PARTE TEMPORARY RESTRAINING ORDER**

Plaintiffs Advanced Powder Solutions, Inc. ("APS"), Bubbletight, LLC ("Bubbletight"), and SWM Enterprises, LLC d/b/a Industrial Supply Company ("Industrial Supply") file this, their Response to Defendants Andrew Sherman's ("Sherman") and Terves, Inc.'s ("Terves") (collectively "Defendants") Motion to Dissolve the Ex Parte Temporary Restraining Order (Defendants' "Motion") [Doc. 13] and, in support thereof, would respectfully show the Court the following:

## I.   SUMMARY OF THE ARGUMENT

The Temporary Restraining Order entered on July 24, 2015 (the "TRO") [Doc. 6] restrains Defendants from "using, disclosing, transferring or commercially exploiting any information . . . obtained from APS's or Bubbletight's computers, email servers, or other electronic storage systems without authorization . . . ." *Id.* If Defendants are correct that they have not stolen Plaintiffs' information, then Defendants cannot demonstrate that the TRO has any adverse impact on their business. However, if the TRO is dissolved, Plaintiffs lose the only viable protection they have for

their stolen information and trade secrets. Thus, the equities clearly weigh in favor of keeping the TRO in force until such time as the Court considers Plaintiffs' Motion for Preliminary Injunction.

Defendants would have this Court believe that Plaintiffs' information has not been stolen by a hacker named "Green Turtle." Defendants contend that the entire story behind "Green Turtle" is fantastical (questioning whether such a person even exists, even though counsel for Plaintiffs has provided Defendants' counsel with his true identity and address), leaving unanswered why this hacker would come forward at considerable risk to himself or, alternatively, contending that a master hoax has been played on all of the parties by some unnamed third person who hatched this diabolical plot for some unspecified reason. Yet, Defendants' alternative theories are undermined by direct evidence that the hacker sent APS's proprietary compositions to Sherman's Terves e-mail account. Defendants admit that the email account belongs to Sherman, however, they claim he never asked for or received the information sent to his email account. And if all the Temporary Restraining Order prevents is Defendants' use of the information the hacker sent to Sherman's email account, the balance of the equities compels that the TRO not be dissolved until sufficient discovery can be completed to unravel this so-called "mystery."

Defendants further contend that they did not use any of the information the hacker sent to Sherman's email account because their TervAlloy Frac-Balls have not changed compositions since they were originally developed in September/ October 2014. Yet even at this early stage in the litigation, where discovery has not commenced, evidence of Defendants' own conduct contradicts this contention. In recent weeks, Defendants have placed on their website—and **backdated to the September 2014 time period**—a number of news articles (and videos) related to their second generation frac balls and products. Clearly the reason for backdating the articles and videos is to give the impression that Terves' second generation products were developed as of September 2014,

and that Terves has been advertising its second-generation TervAlloy products since then. Yet, an examination of Terves' website demonstrates that the videos which were backdated to September 2014, were not even published *until April 2015* (after the hacker sent APS' compositions to Sherman's email address). Further, the videos backdated to September 2014 were not on Terves' website in November 2014 (a mere weeks after the date which Terves backdated the videos). Indeed, there would be strong commercial incentive on the part of Defendants to publish these videos back in September 2014, when allegedly the compositions were developed, rather than wait until April 2015, some 6 months later, to first publish the videos (but backdate them).

In addition to backdating videos, Defendants' conduct related to the marketing brochures placed on the Terves website for the second generation products also contradicts Defendants' contention that the second generation products have remained unchanged since September 2014. Over the past several months, Defendants have published a number of marketing brochures on the Terves website describing the yield strength of their second-generation TervAlloy Frac-Balls (the ones allegedly developed in September 2014). It is axiomatic that a higher yield strength one's product obtains, the more desirable the product. Defendants contend that their second generation products result in higher yield strength than the earlier generation of their product. As such, Defendants had a strong incentive to advertise and market on the Terves website these higher yield strengths back in September 2014, when they claim they developed their second generation product. But they did not do so. The evidence demonstrates that *it was not until spring 2015—after the hacker sent APS' compositions to Sherman's email address (compositions that would result in higher yield strengths than Terves' first generation frac-balls)—*that Terves, for the first time, marketed on its website the higher yield strengths. But then, after Sherman spoke at an industry conference in June 2015, and was questioned by an employee of APS as to the manner in which Terves was now obtaining higher yield

strengths from its second generation products, Terves quickly changed the marketing brochures on its website to reflect *lower yield strengths*, in an apparent effort to hide from APS the fact that Terves was now (in the Spring of 2015) for the first time reporting higher yield strengths, even though Terves contends that the composition of its second generation products has remained unchanged since September 2014.

The only thing that apparently has changed is the composition of Terves's products. It was only after being confronted at a conference in June 2015 that Defendants swapped out their brochures to reflect reduced yield strength for their Frac-Balls. Thus, Defendants can hardly expect this Court to believe—particularly at this preliminary stage while expedited requests for production between the parties are still outstanding—Plaintiffs are unlikely to succeed on the merits and that the TRO should be dissolved today.

For the reasons set forth below, the TRO should not be dissolved, but should remain in effect until such time as the Court considers Plaintiffs' Motion for Preliminary Injunction.

## II.   ARGUMENT AND AUTHORITIES

### A.   THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF KEEPING THE TRO IN FORCE.

The purpose of a temporary restraining order is to preserve "existing conditions pending a decision" on the merits by the Court. *E.g., United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947); *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 829 (5th Cir. 1976). In essence, it preserves the status quo. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974); *Jones v. Belhaven Coll.*, 98 Fed. Appx. 283, 284 (5th Cir. 2004) ("The district court did not abuse its discretion extending the TRO as the court had the inherent authority to preserve the status quo until the question of its jurisdiction could be resolved.").

Defendants claim that the TRO is "causing significant harm to Defendants' business." *Defendants' Motion at pg. 3.* The facts belie that contention. Indeed, as recently as Monday of this week (August 3, 2015), counsel for Defendants (Mr. Mitchell) advised counsel for Plaintiffs (Mr. Friedman) that Defendants were scheduled to make two shipments of products to separate customers (of approximately $1 million worth of product). Counsel for Defendants requested permission from Mr. Friedman allowing the two shipments to be made. Counsel for Plaintiffs indicated that as long as "the compositions of the products [being shipped] are not derived in whole or in part on APS' compositions," they were not precluded by the TRO. Counsel for Defendants represented to counsel for Plaintiffs that the compositions of the products scheduled to be shipped were not derived in whole or in part on the compositions of APS, and Plaintiffs made no objection to the two shipments proceeding as scheduled. *Declaration of Edward Friedman ("Friedman Decl.") at ¶ 3, Exhibit A.* As such, there is no evidence that Defendants' business has been harmed in any meaningful manner. The preservation of the status quo, through the TRO, works no disadvantage to the Defendants. The TRO essentially prevents the Defendants from, using, disclosing, transferring, or commercially exploiting any information improperly obtained from APS or Bubbletight's computers.

On the other hand, the absence of the TRO has the potential to cause *irreparable* harm to Plaintiffs. As the Fifth Circuit itself noted, "considerable authority under Texas law indicates that injuries to goodwill and competitive position are irreparable where trade secrets have been misappropriated." *Heil Trailer Intern. Co. v. Kula*, 542 Fed. Appx. 329, 335 (5th Cir. Oct. 16, 2013) (citing *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.). If the TRO is dissolved and the Defendants are allowed to make use of APS's and Bubbletight's proprietary information for their own benefit, Plaintiffs will lose their trade secrets and their key competitive advantage.

As such, the balance of the equities weighs strongly in favor of keeping the TRO in effect to protect Plaintiffs from suffering irreparable injury, particularly where, as here, the evidence shows Defendants are suffering no harm to their business as a result of the TRO.

### B. PLAINTIFFS' ARE LIKELY TO SUCCEED ON THE MERITS.

Not only have Defendants failed to demonstrate how the balance of the equities weighs in favor of dissolving the TRO, but Defendants have failed to demonstrate that Plaintiffs are not likely to succeed on the merits of their claims. There is substantial evidence—even at this early juncture and prior to discovery—that demonstrates that Defendants are in possession of, and are making use of, information stolen from Plaintiffs, including APS's trade secret compositions for its Frac-Balls.

#### 1. *There is Substantial Evidence that Green Turtle Exists and has Provided APS's and Bubbletight's Stolen Trade Secrets to Sherman/Terves.*

Defendants emphatically claim that they have never had any contact with the hacker known as Green Turtle. *Defendants' Motion at pp. 7-10.* Yet, Defendants readily admit that Sherman's Terves e-mail account is asherman@tervesinc.com. *Doud Decl. at ¶ 25.* This is the *exact same* e-mail account Green Turtle sent a document to that contains APS's proprietary compositions, tolerances, and specifications for its Frac-Balls.[1] *Exhibit A to Noukas Decl.*

```
From: greenturtle@fghtws45sdf.elixure.com
Sent: Wednesday, February 04, 2015 11:46 PM
To: Andy Sherman [mailto:asherman@tervesinc.com]
Subject: Final Report

Attached is my final report.

This will be the only contact you will receive from me unless I have missed information. Please
send the final payment in the form and location agreed to. If payment is not received or I am
discovered the ramifications will be enforced per the terms you agreed to.

greenturtle

final report.pdf
```

---

[1] An un-redacted copy of this e-mail attachment will be tendered to the Court for *in camera* inspection at the hearing.

*While Defendants claim that no such e-mail from Green Turtle exists in Sherman's e-mail account, Defendants' forensic consultant, Roy Rector, in his incomplete forensic report—the flaws with which are discussed in more detail below—readily admits that he never even reviewed the asherman@tervesinc.com e-mail account to verify this fact. Rector Decl. at ¶¶ 5-6* (stating that he was asked to examine the e-mail account ajsherman@powdermetinc.com to determine whether any e-mail messages were sent to or from Green Turtle).

In light of Defendants' claim that Sherman never received the email Green Turtle sent to his e-mail account, Plaintiffs provided Defendants with a draft agreed forensic protocol allowing for a neutral forensic consultant chosen by the parties to conduct an independent— and more thorough—review Sherman's Terves e-mail account and *all* of the computers and devices used by Sherman—rather than just one laptop hand-picked by Defendants to give to their expert—to determine whether in fact Sherman has had any communications with Green Turtle. *Friedman Decl. Exhibit B.* Until such time as an actual independent, fair, and impartial analysis of Sherman's devices and Terves' e-mail account is complete, neither Plaintiffs, nor this Court, can be reasonably asked to "take Sherman's word for it" that he never had any dealings with Green Turtle.

Furthermore, Defendants attempt to explain away Green Turtle as a creature of Plaintiffs' own imagination, or, better yet, the henchman of an as-of-yet unidentified surreptitious third-party who is somehow motivated to manufacture a false money and paper trail to pit Plaintiffs against Defendants. *See* Motion at pg. 8 (claiming that Green Turtle might not even be real and that the documents

7

provided to John Noukas could have been fabricated by a third-party).[2] Defendants' theory on Green Turtle would have this Court believe:

1. An as-of-yet unidentified third-party approached Green Turtle to steal APS's formulas, or Green Turtle—on his own account—decided to hack into and obtain APS' formulas , despite not having any role in the oil and gas industry and having no prior relationship with APS, and then email those compositions to Andrew Sherman's email account;

2. The third-party, or Green Turtle, set up a bank account in the Cayman Islands under Sherman's name, despite having no role in the oil and gas industry and no prior relationship with Sherman, funding it with at least $45,000.00 of his/ their own money;

3. The third-party paid Green Turtle (or Green Turtle paid himself) $45,000.00 from this account in exchange for Green Turtle hacking into Bubbletight's servers; and,

4. The third-party, or Green Turtle, faked multiple communications with Sherman to frame Sherman for the hack.

Why? What possible motivation would a third-party, or Green Turtle himself, have for going through such an arduous process to frame Sherman. How does this third-party, or Green Turtle, possibly benefit either economically or otherwise from doing so? The only persons who stand to benefit from the hack are Defendants.

The far more simpler, and likely, scenario is that Sherman hired Green Turtle to hack Bubbletight's server, and that Green Turtle has since cooperated after being discovered. Green Turtle's veracity is bolstered by the fact that by providing information to Plaintiffs, he is placing himself at risk. Green Turtle's admissions are clearly statements against his own interest that he would not have any incentive to invent or otherwise make up.

---

[2] As the problem-solving principle Occam's razor states, among competing theories, the one with the fewest assumptions should be selected. Or, as more plainly stated, the simplest explanation is often the correct one. The simplest explanation is that Sherman, an admitted direct competitor of Plaintiffs, wanted to obtain APS's formulas, so he hired a hacker-for-hire, Green Turtle, to do so, paying him $45,000.00.

Finally, Defendants' challenge to Green Turtle's existence is patently meritless, particularly inasmuch as Plaintiff' counsel provided Defendants' counsel with Green Turtle's identity and contact information last Friday, July 31, 2015. *Friedman Decl. Exhibit C.*

```
From: Friedman, Edward L.
Sent: Friday, July 31, 2015 2:45 PM
To: Jerry Mitchell (jmitchell@fulkersonlotz.com); Ethan Gibson (egibson@fulkersonlotz.com)
Subject: APS v. Sherman: "Green Turtle"

The identity of "green turtle"

Daewoo Nguyen
8782 Sorrento Ct
Dublin, OH 43016


Email: 1ns5u0+3hv3asyvcpt30@guerrillamail.com

We do not have a phone number for him.

Ed
```

Defendants tellingly fail to inform this Court whether they have made *any* attempt to contact Mr. Nguyen to discuss *any* of the documents he has provided to Plaintiffs.

> 2. **_Defendants' Claim that their Second-Generation TervAlloy Frac-Balls have not Changed since September/October 2014 is Undermined by their own Documents and Conduct._**

Defendants also claim that their TervAlloy second-generation Frac-Balls have not changed since September 2014. Defendants' Motion at pp. 2, 5, 10-14. This assertion is undermined by Defendants' own documents and conduct.

At the outset, Defendants have not attached *any* contemporaneous 2015 specification sheets showing that their compositions are unchanged. Rather, Defendants rely exclusively on 2014 documents and ask this Court to believe them when they say that there has been no change

9

to their compositions.

Further, in recent weeks, Defendants have made highly suspect modifications to their website *after* Green Turtle sent APS's proprietary compositions to Sherman that call into question the veracity of their claim that their compositions have not changed. As of November 2014, the news section of Terves's website did not contain *any* news articles for September 2014. *Friedman Decl. at ¶ 7, Exhibit E.* Yet, today, Terves's news section contains multiple YouTube videos allegedly posted in September 2014 that relate to dissolving metal composites, including frac balls. *Friedman Decl. at ¶ 7, Exhibit F*. When these YouTube videos are opened, it is readily apparent that they were not posted on YouTube until April 13, 2015. *Friedman Decl. at ¶ 7, Exhibit G*. While Defendants have failed to offer any reasonable explanation for the blatant back-dating of advertising materials for their second-generation TervAlloy products, including Frac-Balls, such back-dating gives the illusion to the general public that Defendants have been marketing their second-generation TervAlloy products since September 2014, when in actuality they did not create their marketing materials until April 2015, *after* Green Turtle had sent APS's proprietary compositions to Sherman. If Defendants' compositions have not changed, why would they not have published these videos back in September 2014, when their products were allegedly developed, rather than waiting until April 2015, some six months later, to first publish the videos (but backdate them)?

In addition to backdating videos, Defendants' conduct related to marketing brochures placed on the Terves website for their second-generation TervAlloy Frac-Balls also contradicts Defendants' contention that their compositions have remain unchanged since September 2014. Over the past several months, Defendants have published a number of marketing brochures on the Terves website describing the yield strength of their second-generation TervAlloy Frac-Balls

10

(the ones allegedly developed in September 2014). One brochure contains higher yield strength:

| TervAlloy High Strength | TAx-100E | TAx-50E |
|---|---|---|
| UTS (Ksi) | 48 | 51 |
| YS (Ksi) | 40 | 44 |

*Defendants' Motion at pg. 11; Doud Decl. at ¶ 19, Exhibit B-4*, while a second brochure contains lower yield strength:

| TervAlloy High Strength | TAx-100E | TAx-50E |
|---|---|---|
| UTS (Ksi) | 40 | 40 |
| YS (Ksi) | 30 | 30 |

*Defendants' Motion at pg. 11; Doud Decl. at ¶ 19, Exhibit B-5.* It is axiomatic that a higher yield strength is more desirable. Defendants claim that their second-generation products result in higher yield strength than their earlier generation product. As such, Defendants have a strong incentive to advertise and market on the Terves website these higher yield strengths back in September 2014, when they claim they developed their second-generation product. Yet, the higher yield strength brochure was not placed on Terves's website until spring 2015, *after Green Turtle had provided APS's proprietary compositions to Sherman's Terves e-mail account. Declaration of Dean Baker ("Baker Second Decl.") at ¶ 11.*And, it was not until approximately June 2015—only after being confronted at a conference—that Sherman/Terves elected to replace the higher yield strength brochure with the lower yield strength brochure on Terves's website, where it remains today. *Id.* at ¶¶ 11-12.

The fact that the higher yield strength brochure was not placed online by Terves until spring 2015 is important because a change in composition used results in a change in yield strength. Defendants make much of the fact that they use a different consolidation process than APS for

11

manufacturing their TervAlloy Frac-Balls: Casting. *Doud Decl. at ¶ 13.*[3] <u>Yet, even though Terves and APS use different methods of producing their products, APS's compositions are applicable and valuable in either process; indeed, Dean Baker, APS's CEO, has had experience using APS's compositions in both a casting *and* a forging consolidation process. All things being equal, a change in composition determines, to a large extent, the strength of the product.</u> *See Baker Second Decl. at ¶ 8.* Defendants readily admit that they have not changed their method of consolidation from casting to forging between their first and second-generation frac-balls. *Defendants' Motion at pp. 4-5* ("[Since September 22, 2014], TervAlloy's formula and manufacturing process [has] not changed."). *Thus, the only reasonable explanation for the increased yield strength of Defendants' TervAlloy Frac-Balls in spring 2015 is that Defendants' changed the composition of their TervAlloy Frac-Balls sometime around that time period—which is <u>after</u> Green Turtle sent APS's proprietary compositions to Sherman. Defendants' arguments as to their differing consolidation method are red herrings.*

Defendants' intentional back-dating of their marketing materials on their website, coupled with their shifting brochures, undermines their claim that they have never changed the compositions of their second-generation TervAlloy products, including their Frac-Balls, since September 2014.

Furthermore, Plaintiffs are entitled to test Defendants' claims that their compositions have not changed since September 2014 through the discovery process, which is currently ongoing. Plaintiffs should not be denied the protections of the TRO on the grounds that Defendants' compositions have not changed when Plaintiffs have not yet been provided with

---

[3] Casting is a consolidation process by which liquid material is usually poured into a mold, which contains a hollow cavity of the desired shape, and then allowed to solidify. *Baker Second Decl. at ¶ 7.* APS uses a forging consolidation process. *Id.*

12

documents from Defendants in the course of expedited discovery which could contradict that very claim.

> 3. ***Despite Sherman's Refusal to Cooperate with Plaintiffs in Verifying his Account with the Royal Bank of Canada – Cayman Islands, Plaintiffs have Independently Verified its Continued Existence.***

Defendants also contend that Plaintiffs' claims unravel because Defendants' forensic examiner found no reference to the Royal Bank of Canada on Sherman's hand-picked laptop that was examined under unknown conditions and using undisclosed methods. *Defendants' Motion at pp. 14-15*. Yet, the best evidence of the existence of a bank account is not whether it is referenced in an e-mail, but rather, whether the account actually exists at the institution it is claimed to exist at. To this end, the evidence shows that Green Turtle was paid from a Royal Bank of Canada ("RBC") Account registered in Sherman's name. *Noukas Decl. at Exhibit A*. Upon further investigation, it has been discovered that this particular account was opened at one of RBC's branches in the Cayman Islands. *See Friedman Decl. at ¶ 6*. Plaintiffs contacted the Cayman branch manager, Michael Munnings, who stated that the bank would release the account information only after speaking to Sherman personally. *See id.* Plaintiffs' counsel forwarded this information to Defendants' counsel, requesting that they set up a phone call with all of the Parties' counsel and Sherman to contact Mr. Munnings to verify the Cayman account and to obtain the needed account information. *Id. at ¶ 6, Exhibit D.* To this day, Defendants' counsel has refused to set up the phone call, claiming on Monday, August 3, 2015, that Sherman was travelling and unable to make a phone call. *Id. Yet, Sherman's declaration attached to Defendants' Motion indicates that he was in Houston on August 3, 2015. See Sherman Decl. at*

---

Forging is a consolidation process by which an object is made or shaped by applying extreme amounts of heat and concurrently applying pressure to achieve the desired shape and size. *Id.*

13

*pg. 4* ("Executed this the 3rd day of August, 2015, at **Houston, Texas.**"). Defendants' counsel has yet to explain why Sherman had time to review and execute a declaration in this lawsuit, but not enough time to join a potentially five to ten minute phone call to verify the existence of the Cayman account and request that the account information be disclosed to counsel for both parties: a critical piece of evidence in this case.

Nevertheless, not to be discouraged by Sherman's lack of cooperation, Plaintiffs have independently verified the continued existence of the Cayman account. Dean Baker, APS's CEO and General Manager, is a Bank of America customer and has the ability to check the credentials of a bank account before wiring that account any money. *Baker Second Decl. at ¶ 13.* As a test, Baker set up a wire transfer to the Cayman account using the account number, swift code, and Sherman's name and address associated with the account. *Id.* Bank of America independently verified that account information Baker entered was accurate and that the account was active. *Id.*

Thus, Defendants have not only failed to cooperate with Plaintiffs in verifying the Cayman account, but an independent verification reveals that the account, from which Green Turtle claims he was paid $45,000.00 by Sherman, is an active account. More evidence that Plaintiffs will likely succeed on the merits in this case.

    4.    <u>**Mr. Rector's Incomplete Forensic Examination does not Prove that Sherman and Terves do not have any of Plaintiffs' Information in their Possession.**</u>

Finally, Defendants put forth the self-serving declaration of a forensic consultant hired by Defendants' attorneys to dispute the documented communications between Sherman and Green Turtle. *See* Rector Decl. However, the Rector Declaration is based upon a perfunctory and critically deficient investigation that does not hold up to even the slightest of scrutiny. Specifically, Rector's "examination" of Sherman's *PowderMet email account, hosted on Google*

*Gmail,* and a Compaq laptop suffers from the following deficiencies that render his Declaration unreliable and inadequate:

Rector's Examination of Sherman's PowderMet Email Account:

- Despite the fact that the email from Green Turtle to Sherman was sent to Sherman's <u>Terves email account</u>, Defendants did not ask Rector to conduct an investigation of, or perform searches in, <u>Sherman's Terves email account</u>. *See Rector Decl. at ¶¶ 5-8.* Neither Defendants nor Rector cite any reason, technical or otherwise, for not directly searching Sherman's Terves email account. Instead, pursuant to Defendants' direction, Rector limited his "examination" to Sherman's email account at *PowderMet. Id. at ¶ 5.*

- Rector asserts that the "settings" of Sherman's PowderMet email account show that mail received at Sherman's Terves account are "automatically forwarded" to his PowderMet email account. *See Rector Decl. at ¶ 6.* Yet notably absent from the Rector Declaration is any evidence that the setting was in place in February 2015 when the emails between Sherman and Green Turtle took place. Indeed, Defendants leave the Court without any date of reference for the settings given their failure provide the "Exhibit-01" referenced by Rector as a screen capture of the Gmail account settings. *See Rector Dec. at ¶ 6.*

- Rector makes no effort to explain how his examination methodology of the PowderMet email account could locate the Green Turtle communications if, as is likely the case, Sherman deleted the incriminating communications. *See generally* Rector Decl. For example, Rector does not state whether e-mail archives, including deleted emails, were obtained directly from Google for examination, as they should have been.

Rector's Examination of the hard-drive of a Compaq Laptop:

- No evidence was provided by Defendants, or cited by Rector, establishing that the Compaq laptop examined by Rector was actually used by Sherman during the relevant time period. *See generally Rector Decl. and Sherman Decl.*

- Defendants do not contend, much less provide evidence to show, that Sherman did not use any other computer, such as a personal computer or different Terves computer, during the relevant time period that should have also been examined by Rector. *See generally Rector Decl. and Sherman Decl.*

- The Rector Declaration fails to include any factual detail from which the Court can assess whether Rector's examination was performed pursuant to accepted forensic examination standards. For example, Rector fails to describe the forensic tools utilized to conduct the examination and whether the investigation included unallocated portions of the hard-drive—where artifacts of deleted files can

15

remain. Thorough, well-documented forensic examinations are often laborious and time-consuming. Given that Defendants submitted Rector's perfunctory Declaration only three-days after his engagement, the absence of any description of Rector's examination methodology is likely no oversight.

As these deficiencies highlight, Defendants directed their expert to perform an exceedingly narrow and rushed examination that simply cannot rebut the documented evidence of Sherman's communications with Green Turtle. A thorough and independent forensic investigation is required to resolve Defendants' assertion that, contrary to the documented evidence, Sherman and Terves did not communicate with the hacker and obtain APS's proprietary technology.

Plaintiffs have submitted to Defendants a proposed Agreed Forensic Protocol that establishes a clear, unbiased methodology for performing, on an expedited basis, a forensic investigation by a *neutral* third-party forensic consultant to confirm two critical questions: (1) whether or not any of their information has been stolen by any of the Defendants and (2) whether or not Defendants are in possession of or otherwise using any of Plaintiffs' confidential information and/or trade secrets, while avoiding disclosure of any privileged, private, irrelevant or otherwise objectionable information. Until such time as a neutral forensic consultant, unbiased by any engagement with the Parties, is able to independently verify whether Sherman communicated with Green Turtle, this Court should not just take "Sherman's word for it" and rely on a rushed and incomplete forensic investigation by Defendants to disavow any belief in Plaintiffs' evidence that Sherman hired Green Turtle to steal Plaintiffs' information.

### III.   CONCLUSION

WHEREFORE PREMISES CONSIDERED, Plaintiffs request that the Court deny Defendants' Motion to Dissolve and keep the Temporary Restraining Order [Doc. 6] in effect

until such time as the Court considers Plaintiffs' Request for a Preliminary Injunction. Plaintiffs further request such other and additional relief, both general and specific, at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

Date: August 5, 2015                              Respectfully submitted,

                                                                    **BAKERHOSTETLER LLP**

                                                By: _/s/ Edward L. Friedman_
                                                       Edward L. Friedman
                                                        State Bar No. 07462950
                                                        Federal Bar No. 72833
                                                        efriedman@bakerlaw.com
                                                        811 Main Street, Suite 1100
                                                        Houston, Texas 77002
                                                        Telephone: 713.751.1600
                                                        Facsimile: 713.751.1717

                                              ATTORNEY FOR PLAINTIFFS ADVANCED POWDER SOLUTIONS, INC., BUBBLETIGHT, LLC, AND SWM ENTERPRISE, LLC D/B/A INDUSTRIAL SUPPLY COMPANY

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Federal Rules of Civil Procedure on August 5, 2015.

| | |
|---|---|
| *Via E-mail* | *Via E-mail* |
| Jerry L. Mitchell | Xerxes (Zak) K. Patel |
| Tom Fulkerson | The Zak K. Patel Law Firm, PLLC |
| Ethan Gibson | 4141 Southwest Freeway, Ste. 250 |
| Fulkerson Lotz LLP | Houston, Texas 77027 |
| 700 Louisiana St., Suite 5200 | (713) 570-6000 |
| Houston, Texas 77002-2773 | (832) 514-7046 (Facsimile) |
| (713) 654-5837 | zak@zakpatellaw.com |
| (713) 654-5801 (Facsimile) | *Counsel for Defendant James Huddleston* |
| jmitchell@fulkersonlotz.com | |
| tfulkerson@fulkersonlotz.com | |
| egibson@fulkersonlotz.com | |
| *Counsel for Defendants Andrew Sherman and Terves, Inc.* | |

                                      */s/ Edward L. Friedman*
                                      Edward L. Friedman